COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Humphreys and Millette
Argued at Chesapeake, Virginia


LINWOOD DWAYNE BANDY

                                                             OPINION BY
v.        Record No. 1695-07-1                        JUDGE ROBERT J. HUMPHREYS
                                                             AUGUST 12, 2008

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                              David F. Pugh, Judge

            Patrick L. Bales, Deputy Public Defender (Office of the Public
            Defender, on brief), for appellant.

            Robert H. Anderson, III, Senior Assistant Attorney General
            (Robert F. McDonnell, Attorney General; Richard B. Smith, Special
            Assistant Attorney General, on brief), for appellee.


        Linwood Dwayne Bandy ("Bandy") appeals his conviction for possession of cocaine with

intent to distribute, in violation of Code § 18.2-248.  Bandy argues that the trial court erred by

denying his motion to suppress drugs discovered in his pocket during a pat down.  Bandy claims

that the pat down was the product of an illegal seizure, and, in the alternative, that the

investigating officer exceeded the permissible scope of a Terry frisk.  Finding no error, we affirm

the decision of the trial court.

                                        I.  Background

        "In reviewing a trial court's ruling on a suppression motion, we consider the evidence in

the light most favorable to the prevailing party below, the Commonwealth in this instance,

granting to it all reasonable inferences fairly deducible therefrom."  Askew v. Commonwealth,

38 Va. App. 718, 722, 568 S.E.2d 403, 405 (2002).  So viewed, the evidence established the

following.

At approximately 5:00 p.m. on March 20, 2006, Officer Sorg of the Newport News Police Department was on patrol on Jefferson Avenue in Harbor Homes, a property of the Newport News Housing Authority. Harbor Homes is a "high-drug, high-crime area." Officer Sorg himself had made approximately 20 arrests involving narcotics in Harbor Homes over the past three years.

Officer Sorg saw Bandy and another man, later identified as "Mitchell," exit a vehicle and approach a residence. The two men knocked on the door, but received no answer. After a few moments, Bandy and Mitchell turned from the house and began walking down Jefferson Avenue away from the vehicle. Officer Sorg found the men's actions suspicious and called Officer Nielson to help him investigate. As the officers approached the two men, Mitchell "made a throwing motion toward a bush." Officer Sorg walked over to the bush and discovered a plastic baggie with crack cocaine in it. Officer Sorg handcuffed Mitchell and began questioning him about the cocaine.

As Officer Sorg spoke to Mitchell, Officer Nielson approached Bandy. Officer Nielson said to Bandy, "Pardon me bro, I need to speak with you for a minute if you don't mind." Bandy replied "yeah, sure." Officer Nielson asked Bandy who he was visiting in Harbor Homes. Bandy was unable to give a name or address and gave "extremely evasive" answers. Bandy was "unable to point out a particular location in which he was even attempting to go to." Officer Nielson then asked Bandy where he was coming from. Bandy again gave "evasive, inconsistent answers" and "could not provide a particular point or location" from which he had come. Harbor Homes has several "No Trespassing" signs posted, and the Newport News police are authorized to enforce those signs.

While Officer Nielson spoke to Bandy, Bandy appeared "rather nervous." "He was fidgeting, shifting back and forth his weight on his feet. His hands clinging to his pockets." As

they spoke, Bandy continuously shifted his eyes and looked around, an action that Officer Nielson recognized as a "typical indicator of either flight or suspicious behavior." Officer Nielson twice asked Bandy to remove his hands from his pockets. Bandy complied both times, but "kept moving around, motioning his hands up to his pockets." After having to ask Bandy to remove his hands the second time, Officer Nielson believed that Bandy might be concealing a weapon. Officer Nielson explained, "He kept putting his hands in his pockets. To me that's indication that he might be reaching for something which could harm me or my partner."

In light of those safety concerns, Officer Nielson told Bandy that he needed to pat him down to check for weapons. Officer Nielson later testified that during any pat down, he uses his open hand, with his "fingers spaced" to feel "every single portion" of the person's body. He explained that by keeping his fingers spread, "[his fingers] are able to move any loose items which may be in there as opposed to keeping [his fingers] tight together which would bundle everything inside." Due to the size of the average person's thigh in relation to Officer Nielson's hand, he must pat each thigh twice, once from the front and once from the rear, in order to cover the entire thigh. As Officer Nielson frisked Bandy, he felt a bulge with his palm and heard a crinkle in a small pocket on the side of Bandy's right thigh. Officer Nielson patted down Bandy's right thigh a second time, as he does in all pat downs. On his second pass, he patted the bulge in Bandy's pocket with his fingers. At that point, Officer Nielson was able to feel several small items that he described as "hard [and] rocky." Based on his training and experience, Officer Nielson immediately recognized the items as crack cocaine rocks. Officer Nielson later testified that he did not use his fingers to manipulate the items in Bandy's pocket and that he kept his hand on Bandy's thigh no longer than necessary to pat it. Officer Nielson then placed Bandy in handcuffs, reached into his pocket, and discovered a bag containing crack cocaine.

- 3 -

Throughout the encounter, Officers Sorg and Nielson were the only officers on the scene. Their patrol car was parked a block away without its lights or sirens on, and neither officer drew his weapon.

The Commonwealth subsequently charged Bandy with possession of cocaine with intent to distribute. Prior to trial, Bandy filed a motion to suppress the cocaine. He argued that the discovery of the cocaine was the result of an impermissible seizure and/or an impermissible search. The trial court denied Bandy's motion to suppress and ultimately found him guilty.

Bandy now appeals the trial court's denial of his motion to suppress.

## II.  Analysis

Bandy makes two claims on appeal. First, he argues that he was "seized" by Officer Nielson when Nielson first approached him, and that seizure was not supported by probable cause or reasonable suspicion. Second, he argues that, even if Officer Nielson had sufficient grounds to stop and frisk him, Officer Nielson's pat down exceeded the scope of a proper Terry frisk.

Determining whether a seizure has occurred and whether a frisk for weapons is constitutional is "a mixed question of law and fact." Ornelas v. United States, 517 U.S. 690, 696 (1996). Accordingly, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997). However, we review the application of the Fourth Amendment to those facts *de novo*. See Ornelas, 517 U.S. at 691.

## A.  The Seizure

In order to determine whether Officer Nielson could lawfully seize Bandy, we must first address when the seizure occurred. Bandy argues that the seizure occurred when Officer Nielson

first approached him. The Commonwealth contends that Officer Nielson's initial approach was consensual and that he did not seize Bandy until after he discovered that Bandy was trespassing. We agree with the Commonwealth.

"In order for a seizure to occur, an individual must be under some physical restraint by an officer or have submitted to the show of police authority." Thomas v. Commonwealth, 24 Va. App. 49, 54, 480 S.E.2d 135, 137 (1997) (*en banc*). "There is no 'litmus test' for determining whether an encounter is consensual or constitutes an illegal seizure. If, however, a reasonable person would not feel free to decline an officer's requests or would not feel free to leave, the encounter is not consensual and constitutes an illegal seizure under the Fourth Amendment." Harris v. Commonwealth, 266 Va. 28, 32, 581 S.E.2d 206, 209 (2003) (citations omitted).

> Various factors have been identified as relevant in determining whether a seizure has occurred, including the threatening presence of a number of police officers, the display of weapons by officers, physical contact between an officer and a citizen, an officer's language or tone of voice compelling compliance, the retention of documents requested by an officer, and whether a citizen was told that he or she was free to leave.

Id. Ultimately, "[t]he decision whether the encounter was consensual must be made based on the totality of the circumstances." Id.

In light of all of the surrounding circumstances, it is apparent that Officer Nielson's initial interaction with Bandy was consensual. Officer Nielson made no show of force or authority and did not physically restrain Bandy. Officer Nielson approached Bandy and asked to speak with him. Bandy agreed, saying "yeah, sure." The officers' patrol car was parked a block away without its lights on. Bandy was not surrounded by several police officers. Neither of the officers displayed their weapon or physically touched Bandy during the initial interaction.

- 5 -

Nothing about Officer Nielson's initial approach would make a reasonable person conclude that they were not free to leave.

The consensual nature of the encounter changed, however, when Officer Nielson told Bandy that he needed to pat him down. At that point, no reasonable person would have felt free to leave. See, e.g., Walker v. Commonwealth, 42 Va. App. 782, 790, 595 S.E.2d 30, 34 (2004) (holding that a seizure had occurred when the officer "explained that he intended to pat down" a suspect because, "at this point, a reasonable person would not believe he could ignore the officer's requests and walk away"). However, the fact that the encounter ceased to be consensual does not necessarily invalidate Officer Nielson's actions. "An officer may conduct a pat-down search for weapons if the officer can point to specific and articulable facts which reasonably lead him to believe criminal activity may be afoot and the person subjected to the search may be armed and dangerous." Lowe v. Commonwealth, 33 Va. App. 656, 660-61, 536 S.E.2d 454, 456-57 (2000). By the time Officer Nielson seized Bandy, he had reasonable suspicion that Bandy had committed a crime and that Bandy was armed and dangerous.

Aside from Officer Nielson's drug-related suspicions arising out of Bandy's association with Mitchell, Officer Nielson had reasonable suspicion that Bandy was trespassing. Under Code § 18.2-119, it is a crime to "go[] upon . . . the lands, buildings or premises of another, or any portion or area thereof . . . after having been forbidden to do so by a sign or signs." At the time of the encounter, Bandy was on the property of the Newport News Housing Authority. Officer Nielson testified that there are "No Trespassing" signs throughout the neighborhood and that the Newport News police have the authority to enforce trespassing in that neighborhood. When asked whom he was visiting in Harbor Homes, Bandy was unable to give a name or address and gave "extremely evasive" answers. Bandy was "unable to point out a particular location in which he was even attempting to go." In light of Bandy's evasive and inconsistent

answers and inability to provide a legitimate reason for his presence in Harbor Homes, it was reasonable for Officer Nielson to suspect that Bandy was trespassing. Because Officer Nielson had reasonable suspicion that Bandy was committing a crime, he was within his authority to seize Bandy for an investigative detention.

Officer Nielson also had reason to believe that Bandy was armed and dangerous. Bandy was trespassing in a "high-drug, high-crime" area of Newport News, and Bandy's companion had just been seen throwing a bag of cocaine into a bush. Courts have often recognized that "'the connection between illegal drug operations and guns is a tight one.'" Jones v. Commonwealth, 272 Va. 692, 701 n.3, 636 S.E.2d 403, 407 n.3 (2006) (quoting United States v. Grogins, 163 F.3d 795, 799 (4th Cir. 1998)). As Officer Nielson spoke to him, Bandy appeared "rather nervous." Bandy "was fidgeting, shifting back and forth his weight on his feet. His hands clinging to his pockets." He continuously shifted his eyes and looked around, an action that Officer Nielson recognized as a "typical indicator of either flight or suspicious behavior." As the two men spoke, Bandy put his hands in his pockets. Officer Nielson asked him to remove his hands, explaining that "it was an officer safety issue." Bandy removed his hands from his pockets, "but he still kept moving around motioning his hands up to his pockets." Bandy then put his hands in his pockets a second time, despite Officer Nielson's instructions not to. At that point Officer Nielson had reason to believe that Bandy might have a weapon in his pocket and was preparing to use it. Bandy's nervousness, his inability to explain his presence on private property, his association with a man carrying cocaine, and his repeated motions toward his pocket made it reasonable for Officer Nielson to believe that Bandy was armed and dangerous.

Because Officer Nielson had reasonable suspicion that Bandy was committing a crime and was armed and dangerous, his decision to seize and frisk Bandy, as he investigated his suspicions, did not violate the Fourth Amendment.

Bandy also claims that Officer Nielson exceeded the permissible scope of a <u>Terry</u> frisk by patting his thigh twice and by doing so with spread fingers.  Bandy argues that Officer Nielson impermissibly manipulated the items in Bandy's pocket because his spread fingers caused the items to separate when he patted them.[1]  We disagree.

Once a frisk is justified, the Fourth Amendment allows the officer to undertake "a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault him."  <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968).  "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ."  <u>Adams v. Williams</u>, 407 U.S. 143, 146 (1972).  Such searches are "limited in scope to this protective purpose."  <u>Id.</u>

In <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 373 (1993), the Supreme Court of the United States addressed "whether police officers may seize nonthreatening contraband detected during a protective patdown search of the sort permitted by <u>Terry</u>."  The Court decided that "the answer is clearly that they may, so long as the officers' search stays within the bounds marked by <u>Terry</u>."  <u>Id.</u>  It reasoned that "if a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons."  <u>Id.</u> at 375.

---

[1] Bandy does not argue that Officer Nielson did not ultimately have probable cause to believe that the "hard, rocky" items in his pocket were cocaine.  <u>See</u>, <u>e.g.</u> <u>Cost v. Commonwealth</u>, 275 Va. 246, 253-54, 657 S.E.2d 505, 508-09 (2008) (holding that an officer lacked probable cause to recover capsules from a suspect's pocket following a pat down, where the illegal character of capsules "could not have been immediately apparent" from the pat down because the capsules "may just as well be a legal medication dispensed in capsule form [rather than] a capsule containing an illegal drug").  He merely claims that the nature of the items was not immediately apparent because Officer Nielson could not identify the items after the first pat.

In Dickerson, an officer initiated a valid Terry frisk. During the pat down, the officer felt "a small lump" in the suspect's jacket, and, after examining it with his fingers, concluded that the lump was crack cocaine. Id. at 369. The officer reached into the suspect's jacket and retrieved the item. The Court held that the officer exceeded the scope of a valid Terry frisk, noting that the officer "made no claim that he suspected this object to be a weapon" when he felt it under the suspect's jacket. Id. at 378. The Court explained, "the officer's own testimony belies any notion that he 'immediately' recognized the lump as crack cocaine. Rather, . . . the officer determined that the lump was contraband only after squeezing, sliding, and otherwise manipulating the contents of the defendant's pocket – a pocket which the officer already knew contained no weapon." Id. The Court held that where a "protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed." Id. at 373.

Bandy seizes upon the "squeezing, sliding, and otherwise manipulating" language from Dickerson, and argues that, by keeping his fingers spread, Officer Nielson impermissibly manipulated the items in Bandy's pocket. However, Bandy's argument is premised on a fundamental misunderstanding of Dickerson. Dickerson does not stand for the principle that an officer may never squeeze, slide or manipulate items felt during a pat down. The purpose of a pat down is to protect the officer during a Terry stop by allowing him to determine whether the suspect is concealing a weapon. Terry, 392 U.S. at 30. "Such searches necessarily involve a certain amount of 'squeezing, sliding and otherwise manipulating' of a suspect's outer clothing, in an attempt to discern whether weapons are hidden underneath." United States v. Yamba, 506 F.3d 251, 258 (3d Cir. 2007) (quoting Dickerson, 508 U.S. at 378). The manipulation of an item under a suspect's clothing is only unlawful if the officer "goes beyond what is necessary to determine if the suspect is armed." Dickerson, 508 U.S. at 373; see also Hayes v.

- 9 -

<u>Commonwealth</u>, 29 Va. App. 647, 660, 514 S.E.2d 357, 363 (1999) ("The officer may not engage in 'squeezing,' 'sliding' or 'otherwise manipulating' the item *once he has concluded it is not a weapon*." (quoting <u>Dickerson</u>, 508 U.S. at 378) (emphasis added)).

The crux of any analysis of whether an officer exceeds the scope of a <u>Terry</u> "frisk" is simply whether the actions of the frisking officer go beyond the basic determination of whether a suspect is armed. If the officer's actions are reasonably calculated to determine whether the suspect possesses a weapon, then the pat down is constitutionally proper. Conversely, the officer exceeds the constitutional constraints of a <u>Terry</u> frisk if he is trying to determine, through his sense of touch, the nature or identity of an object he knows cannot be a weapon. Here, Officer Nielson did not go beyond what was necessary to determine whether Bandy was armed. Officer Nielson testified extensively as to what measures he takes during a pat down to ensure that a suspect is not armed. He explained that, during a pat down, he uses his open hand to feel "every single portion" of the person's body. In order to accomplish that, he has to pat each thigh twice, once from the front and once from the rear. Without patting the thigh twice, he would not be able to feel the entire thigh and could not adequately determine whether the suspect is armed. Officer Nielson also explained that, during a pat down, he keeps his fingers spread, in order to better identify any objects that he might feel under a suspect's clothing, including weapons.

Officer Nielson frisked Bandy, as he does all suspects, by using his open hand to pat every portion of Bandy's body. His pat down was properly directed at making sure that Bandy was not armed. Officer Nielson did not focus his frisk on Bandy's thigh and, in feeling Bandy's thigh, did not use his hands differently than he did in feeling the rest of Bandy's body. The record supports the trial court's conclusion that Officer Nielson's frisk was limited in scope to its proper purpose: the discovery of weapons. He paid no greater attention to Bandy's thigh than was necessary to rule out the presence of a weapon. There was simply "no invasion of [Bandy's]

- 10 -

privacy beyond that already authorized by [Officer Nielson's] search for weapons." <u>Dickerson</u>, 508 U.S. at 375.  Thus, the frisk did not exceed its proper constitutional scope.

III. Conclusion

Based on the foregoing, we hold that Officer Nielson's seizure of Bandy did not violate the Fourth Amendment and that the frisk did not exceed its permissible scope.  Therefore, we hold that the trial court did not err by denying Bandy's motion to suppress.

<u>Affirmed.</u>