COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Raphael and White
Argued at Richmond, Virginia

NICHOLAS SHAVON SMITH

                                                          MEMORANDUM OPINION* BY
v.        Record No. 1526-23-2                        JUDGE KIMBERLEY SLAYTON WHITE
                                                              DECEMBER 3, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Tracy Thorne-Begland, Judge

Elena Kagan, Assistant Public Defender (Catherine French
Zagurskie, Chief Appellate Counsel; Virginia Indigent Defense
Commission, on briefs) for appellant.

Allison M. Mentch, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

One evening, Officer Lance Barnes-Christian noticed a bulge in the jacket of Nicholas

Shavon Smith as Smith was walking near his apartment.  Barnes-Christian called out to Smith,

who did not respond or stop walking, then approached him and asked conversationally whether

Smith had a firearm on him.  Being told no, Barnes-Christian asked Smith in a non-threatening

manner if he could pat him down.  Smith unambiguously consented.  The bulge was discovered

to be a gun, and Smith was charged as a violent felon wrongfully in possession of a firearm.  His

motion to suppress the evidence under the Fourth Amendment was denied, and he accepted a

guilty plea conditional on his right to appeal the suppression issue.  Finding that Barnes-

Christian stayed within the bounds of Smith's consent during this consensual encounter, we

affirm the denial of the motion to suppress.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND

On the evening of February 16, 2023, Officer Barnes-Christian of the Richmond Police Department was patrolling the Highland Park neighborhood in a marked police vehicle. On that same evening, Smith was walking to his home in Highland Park. Barnes-Christian was driving through a roundabout when he witnessed a "bulge" in Smith's jacket and called out "hey sir" in Smith's direction. The officer later stated that he did not know whether Smith lived in the area and did not suspect him of any criminal activity.

Without acknowledging the officer, Smith changed direction and started walking towards an apartment building across the street. After Smith failed to respond, Barnes-Christian parked on a side street, got out of his cruiser, and walked towards Smith. As he approached Smith, Barnes-Christian called out in a conversational tone, "Hey sir, I was trying to get your attention." Barnes-Christian was in uniform, displaying his badge of authority, with his service weapon visible on his hip. He testified that he did not give Smith any commands.

Smith testified that Barnes-Christian shouted at him to stop as Smith walked towards his apartment building. Smith eventually responded to the officer by stopping in front of his apartment building and turning to face Barnes-Christian. The officer told Smith that he had seen a bulge in his jacket and asked him if he had a firearm. Smith answered "no, I have nothing," patting his pants as he shook his head. As they spoke, Smith attempted to continue toward the door of his building, and Barnes-Christian followed him and moved in front of him. Barnes-Christian denied blocking or preventing Smith from leaving. In conflict with the officer's testimony, Smith testified that Barnes-Christian stepped between Smith and the door. On cross-examination, Smith elaborated that the officer "stepped in front of me and grabbed my jacket" before asking to conduct the pat down. Barnes-Christian never told Smith he was free to leave.

- 2 -

Barnes-Christian then asked Smith if he could pat him down "real quick," and Smith responded affirmatively by nodding his head.

Smith elaborated on his decision to allow the pat down by saying that it "felt very forced, so that's why I just surrendered." Smith also said, "Even if I kept walking, he still had my jacket. Like, he was still in front of me, guarding me . . . ."

Barnes-Christian's body-worn camera was not turned on until after the pat down occurred.[1] He acknowledged that this failure to turn the camera on violated Richmond Police Department policy, which requires an officer to turn on his body-worn camera when interacting with citizens.

Barnes-Christian testified that after receiving Smith's consent he touched the outside of Smith's jacket with one hand using an open palm. He felt a metal object which he believed was a firearm based on its frame and weight. He grabbed the item, asked Smith what it was, and Smith answered, "It's a firearm." The officer grabbed Smith's jacket with his right hand, pulling it towards him, while his flashlight-wielding left hand searched the jacket. Smith was arrested and charged with possession of a firearm by a previously convicted violent felon in violation of Code § 18.2-308.2.

At trial, defense counsel acknowledged that there was "some dispute over whether there was an actual call to stop." Defense counsel emphasized that on cross-examination, Barnes-Christian acknowledged telling Smith to stop but on re-direct denied giving any commands. Defense counsel emphasized that "Smith testified unimpeached" that he was ordered to stop. Additionally, defense counsel argued that Barnes-Christian "exceed[ed] the bounds of the

---

[1] Although Officer Barnes-Christian admitted that he did not turn on his body camera until after the pat down was complete, in violation of the Richmond Police Department's policy, the body camera "rolls back 30 seconds" after it is turned on, thus displaying the pat down.

consent that was given, which was for a pat down, not for a full search," when he pulled the jacket and manipulated it.

The trial court rejected the defense's arguments. It found that the officer had no credibility issues, whereas Smith had been convicted of crimes of moral turpitude involving "lying, cheating or stealing" and had an obvious bias to lie in order to "get himself out of hot water." The trial court found that Barnes-Christian approached Smith and asked him in a conversational tone, "Can I talk to you for a minute?" It found that Smith stopped voluntarily and falsely said no when first asked if he had a firearm. Barnes-Christian asked Smith, "Can I pat you down?" Smith answered yes. The trial court found that the officer did not have any physical contact with Smith prior to the pat down and "did not see on the video body-worn camera any overt blocking." Barnes-Christian never removed his gun from its holster on his side.

The trial court credited Barnes-Christian's testimony and disbelieved Smith. It concluded that Barnes-Christian did not ask Smith to stop or give any other commands and found based on the body camera footage that he did not get in Smith's way. The trial court found that the incident was a consensual encounter and a consensual, proper pat down. It concluded that it did not see "any overbearing show of authority that would make a reasonable person feel they couldn't leave." It emphasized that Smith agreed to stop and speak with the officer and found that Smith consented to the pat down. Without expressly ruling whether Barnes-Christian's left hand manipulated the firearm during the search or remained in an open-palm position, the trial court nonetheless credited the officer's testimony, which tended to establish that he conducted the search with an open palm and without manipulation. On direct examination, Barnes-Christian stated that he used an "open-palms touch" when he touched Smith's jacket and before grabbing the item inside the jacket. The officer even gestured at least twice during his testimony

— the transcript describes the gestures as "indicating laying palms flat" and "[i]ndicating open palms." On cross-examination, the officer again stated that his "hand gesture . . . was open palms going underneath the item."[2] Accordingly, the trial court denied the motion to suppress.

Smith entered a conditional guilty plea to an amended charge of possession of a firearm by a previously convicted non-violent felon. By final order entered August 16, 2023, the trial court sentenced Smith to five years of incarceration, with two years and six months suspended, for an active sentence of two years and six months.

## ANALYSIS

When reviewing an order denying a motion to suppress evidence, "the Court reviews *de novo* the overarching question of whether a search or seizure violated the Fourth Amendment." *Moreno v. Commonwealth*, 73 Va. App. 267, 274 (2021) (citation omitted). Where an appellant's claim that their Fourth Amendment rights were violated presents a mixed question of law and fact, the reviewing court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." *Merid v. Commonwealth*, 72 Va. App. 104, 109 (2020).

The burden to establish that the denial of the motion to suppress constituted reversible error rests with the defendant. *Roberts v. Commonwealth*, 55 Va. App. 146, 150 (2009). On appeal, this Court views the evidence in the light most favorable to the Commonwealth, including all reasonable inferences that may be fairly drawn from such evidence. *See Commonwealth v. Grimstead*, 12 Va. App. 1066, 1067 (1991). An appellate court "owe[s]

---

[2] Smith asserts that the following exchange during cross-examination contradicts the officer's testimony that he used an open palm to conduct the pat down: "Q: And you said you [were] using your left hand to also feel the item? A: Yes. Q: Okay. And you did not have open palms, correct, with your left hand? A: That's correct." Smith, however, ignores the officer's testimony that it was following the open palm feel and recognizing the feel of the firearm, when the officer did grab the weapon.

- 5 -

deference to the trial court's interpretation of all of the evidence, including video evidence." *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022). We thus review video evidence "not to determine what we think happened, but for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did." *Id.*

Smith argues that Officer Barnes-Christian violated his Fourth Amendment rights. Under the Fourth Amendment, "a warrantless search is per se unreasonable, subject to certain exceptions." *Fore v. Commonwealth*, 220 Va. 1007, 1010 (1980). Even where one of these exceptions to the warrant requirement applies, "brief investigatory stops, commonly referred to as '*Terry*'[3] stops . . . must be based upon reasonable, articulable suspicion that criminal activity is or may be afoot." *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc). "'[H]ighly intrusive, full-scale arrests' or searches," on the other hand, must be based on more than just reasonable suspicion, requiring "probable cause to believe that a crime has been committed by the suspect." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1939)). Unlike *Terry* stops or full-scale arrests, consensual encounters between law enforcement and the public do not implicate the Fourth Amendment at all. *See Iglesias v. Commonwealth*, 7 Va. App. 93, 99 (1988).

Smith asserts that any search or stop conducted by Barnes-Christian was done without probable cause or reasonable suspicion. Smith thus continues that any search or stop would be unreasonable under the Fourth Amendment unless he gave his express consent. He makes three arguments on why the motion to suppress should have been granted: first, the pat down exceeded the scope of his consent; second, Smith's consent was not voluntary; and third, the encounter was not consensual and, lacking probable cause or reasonable suspicion, the encounter was an illegal stop. We address each in turn.

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1969).

## A. Whether the Pat Down Exceeded the Scope of Consent

Smith argues three related points when referring to the scope of the pat down. First, he argues that Barnes-Christian did not use an open palm and instead "immediately grabbed" Smith's jacket. Next, he argues that the officer improperly manipulated the contents of Smith's pockets even though it was not immediately apparent that Smith was carrying contraband. Finally, Smith asserts that the officer conducted a "full-blown general search," not just a pat down. Overall, Smith argues that Barnes-Christian's search invaded his person beyond the outer surfaces of his clothes and therefore improperly exceeded the bounds of Smith's consent.

The Commonwealth asserts that the pat down was lawful because Barnes-Christian grabbed the firearm only once he reasonably believed it was a weapon. We hold that the pat down was lawful and within the limits provided by Smith's consent.

"A consensual search is reasonable if the search is within the scope of the consent given." *Bolda v. Commonwealth*, 15 Va. App. 315, 316-17 (1992) (quoting *Grinton v. Commonwealth*, 14 Va. App. 846, 850 (1992)). An officer's search falls within the scope of a person's consent if it was "objectively reasonable" for the officer to believe that the person's consent "permitted [the officer] to search where [he] did." *Grinton*, 14 Va. App. at 851. A search may be objectively reasonable if it is "based on a general consent to search" for the type of item or contraband stated in the request the officer makes to the person. *See id.*

The trial court found that, given the wording of Barnes-Christian's request and Smith's affirmative response to it, Smith consented to a pat down. A pat down is understood to be identical to a *Terry* frisk. *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) ("*Terry* further held [that an] officer may conduct a pat-down search 'to determine whether the person is in fact carrying a weapon.'" (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968))); *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998) (using the terms "frisk" and "pat-down" interchangeably). An

officer's actions during a *Terry* frisk are constitutionally proper if they are "reasonably calculated to determine whether the suspect possesses a weapon." *See Bandy v. Commonwealth*, 52 Va. App. 510, 521 (2008). For example, the officer in *Terry* conducted a "carefully limited search of the outer clothing" of the suspect while never "invad[ing the suspect's] person beyond the outer surfaces of his clothes." *Terry*, 392 U.S. at 30. Whether the officer frisked the suspect with open palms may be an important factor in determining if he exceeded the scope of the pat down. *See, e.g.*, *Hayes v. Commonwealth*, 29 Va. App. 647, 660 (1999) (finding that an officer exceeded the scope of a pat down where the contraband character of a lump he felt in the suspect's pocket was not "immediately apparent to him after patting it with an open hand"). This case law makes clear that Barnes-Christian did not exceed the scope of Smith's consent if his actions during the pat down were within the parameters of a *Terry* frisk.

We first address Smith's argument that by grabbing the jacket rather than using an open palm, the officer exceeded the scope of a reasonable pat down. Smith claims that in grabbing his jacket rather than patting down the outside, Barnes-Christian exceeded the scope of what a "typical, reasonable person" would have understood by a pat down. The Commonwealth responds that, viewing the evidence in the light most favorable to it, Barnes-Christian may have grabbed Smith with his right hand while using an open palm to pat down Smith's jacket with his left hand. Only after feeling that the item appeared to be a firearm based on its frame and weight did the officer abandon the open palm to grab and remove it.

Viewing the evidence in the most favorable light to the Commonwealth, we conclude that it was not plain error for the trial court to find that Barnes-Christian searched Smith with an open palm. The officer's grabbing of Smith's jacket was "reasonably calculated" to ascertain if he had a firearm because it kept Smith still while Barnes-Christian made his determination. *See Bandy*, 52 Va. App. at 521. Barnes-Christian saw a lump in Smith's pocket, touched it with his hand,

felt that it was a weapon, and then grabbed and removed it. His act is consistent with determining whether Smith had a firearm on his person. We also note that even if Barnes-Christian impermissibly grabbed the jacket with his right hand, it was his left hand that conducted the pat down that led to the discovery of the firearm. Thus, the firearm was not the fruit of the grabbing hand, but of the other hand.

Next, Smith argues that Barnes-Christian exceeded the scope of the pat down by manipulating the firearm in Smith's pocket even though it was not "immediately apparent" that the firearm was contraband. *See Murphy v. Commonwealth*, 264 Va. 568, 574-75 (2002). Smith asserts that even if it was immediately clear that the item was a firearm, Barnes-Christian lacked a basis for believing it was contraband because he could not have known whether Smith was carrying it lawfully. We disagree.

As to manipulating the firearm, the trial court did not make a finding that Barnes-Christian manipulated the firearm prior to discovering that it was a firearm and credited Barnes-Christian's testimony stating that he used an open-palm position to search Smith. The officer, through words and gestures, testified that his initial touch of Smith was with an open palm. Any later grabbing of the weapon was after the feel revealed the firearm and when Smith admitted that it was a firearm.

As to the immediately apparent nature of the contraband, we note that under Virginia law, it is illegal for an individual to carry a concealed firearm unless the individual falls within an enumerated exception or has a valid permit. Code §§ 18.2-308(A), 18.2-308.01(A). Accordingly, carrying a concealed weapon in Virginia is presumptively criminal until the individual establishes that an exception applies or presents a permit. *See Myers v. Commonwealth*, 299 Va. 671, 678-79 (2021) (noting that the exceptions act as affirmative defenses). Thus, Barnes-Christian was permitted to reasonably suspect that the weapon was

contraband even without knowing whether Smith had a valid permit. *See United States v. Morton*, 400 F. Supp. 2d 871, 878-79 (E.D. Va. 2005) (holding that "it is reasonable to construe [Code § 18.2-308(A)] to place on citizens the burden of proving facts that demonstrate the possession of a permit" and that "the statute allows a law enforcement officer who has reasonable, articulable suspicion that a person is carrying a concealed handgun in Virginia briefly to detain the person to ascertain whether the conduct is prohibited or not").

Additionally, Smith's dishonesty in denying having a firearm prior to the pat down paired with Barnes-Christian's feeling one during the pat down provided further reasonable suspicion to believe that Smith illegally possessed the gun. Therefore, Barnes-Christian acted properly in frisking for the item while it was in Smith's pocket to confirm or dispel his reasonable suspicion of illegal activity. *See Bandy*, 52 Va. App. at 521-22.

Finally, Smith argues that Barnes-Christian committed a full, general search of Smith by going through his pockets and thereby exceeded the scope of the consent that Smith provided. Given that the search was outside the boundaries of his consent, Smith asserts that its fruits must be excluded from evidence.

Smith compares the facts here to two cases where an officer exceeded the scope of a suspect's consent to be searched. In *Carter v. Commonwealth*, 79 Va. App. 329 (2023), an officer asked Carter if he had weapons on his person and, being told no, obtained Carter's consent to search him "just to make sure" he had none. *Id.* at 335-37. The officer then rummaged through items retrieved from Carter's pockets that he knew were not weapons, suspecting they contained illegal drugs. *Id.* at 337. This Court held that the search exceeded the scope of Carter's consent because it was "objectively unreasonable" to believe that Carter had consented to a "general search" for evidence of drugs rather than a "limited search" for weapons. *Id.* at 341.

In *Bolda v. Commonwealth*, an officer stopped Bolda and asked him if he had any weapons or "anything of that nature." 15 Va. App. at 316-17. After saying no, Bolda gave his consent for the officer to search "[his] person." *Id.* The officer patted Bolda down and felt a two-inch-long piece of hard plastic that he withdrew from Bolda's pocket; the object contained illegal drugs. *Id.* at 316. This Court found it objectively unreasonable to conclude that by consenting to the officer's request to search his person Bolda had consented to a "general search" of his pockets' contents, since the officer's questions to Bolda had "implied only a concern about weapons." *Id.* at 317.

Smith's reliance on *Carter* and *Bolda* is misplaced. In those cases, the officers explicitly requested to search the suspects for weapons. Although it was immediately apparent to the officers that the items they felt were not weapons, the officers nevertheless seized them. The suspects had given the officers limited consent to search their persons for weapons, which the officers exceeded by seizing the items despite knowing they were not weapons. *Carter*, 79 Va. App. at 341; *Bolda*, 15 Va. App. at 319. Officer Barnes-Christian received consent that was similarly limited to a search for weapons, but unlike *Carter* and *Bolda*, he reasonably suspected that the bulge in Smith's pocket was an illegally carried firearm.

Smith rounds out his scope-of-consent argument by asserting that, where the officers in *Bolda* and *Carter* only impermissibly "extended [their] search[es]" to the suspects' pockets, Barnes-Christian extended his search into a "full-blown seizure" of Smith when he grabbed his jacket. Smith argues that "[i]n grabbing [his] jacket and pulling him, the officer applied force to restrain him, effecting an arrest." We disagree.

Without triggering an arrest, a brief investigative detention allows an officer to apply "incidental" restraints to a suspect that are "calculated to confirm or dispel the suspicion quickly and with minimal intrusion upon the person detained." *Hamlin v. Commonwealth*, 33 Va. App.

- 11 -

494, 501-02 (2000) (citing *Thomas v. Commonwealth*, 16 Va. App. 851, 856-57 (1993)). For example, this Court has found that asking a suspect to return to the car in which they sat when they were stopped and conducting a 15- to 20-second-long investigative detention did not trigger an arrest. *Id.* at 502. Even being "escorted from a congested public thoroughfare" like an airport and taken "to the privacy of a police substation within the nearby terminal building" was held to be incidental to an investigatory detention and not "unnecessarily intrusive or protracted." *Wechsler v. Commonwealth*, 20 Va. App. 162, 172 (1995).

Barnes-Christian's grabbing of Smith's jacket was not an unreasonable seizure that constituted an arrest. Instead, Barnes-Christian applied appropriate force for the purpose of completing the search for weapons to which Smith had consented. Smith was restrained for only a few seconds, was not moved anywhere, and had consented to the encounter. "We, therefore, cannot say that based upon the totality of the circumstances, such a brief detention to investigate possible criminal activity was unreasonable." *See Hamlin*, 33 Va. App. at 502.

The trial court thus did not err in denying the motion to suppress on the grounds that the pat down went beyond the bounds of Smith's consent. Viewed in the light most favorable to the Commonwealth, the evidence permits the finding that the officer conducted a proper pat down of Smith within the parameters of the consent he gave.

### B. Whether Smith's Consent was Voluntary

Smith next argues that the trial court was plainly wrong in finding that his consent to Officer Barnes-Christian's pat down was voluntary. The Commonwealth counters that the officer did not coerce Smith and that the consent was completely voluntary.

"[A] search authorized by consent is wholly valid." *Kyer v. Commonwealth*, 45 Va. App. 473, 483 (2005) (en banc) (citation omitted). An appellate court will uphold the trial court's finding that the Commonwealth successfully bore its burden of proving that consent was

voluntary unless it is plainly wrong or lacks evidence to support it. *See Camden v. Commonwealth*, 17 Va. App. 725, 727 (1994).

Whether a person's consent to a police search is voluntary is a factual question "to be determined from all the circumstances." *Davis v. Commonwealth*, 37 Va. App. 421, 433 (2002). Voluntariness may exist even where the person was not told that they had the "right to refuse" to consent to the search. *Id.* Other relevant circumstances include the person's age, how long they were detained, and whether the questioning was prolonged and repeated, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), as well as "the conditions under which the consent to search was given," such as the conduct and number of the officers, *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (en banc). To upset a finding that consent was voluntary, it must be clear error to find that the person's consent was an "essentially free and unconstrained choice" rather than a result of "his 'will ha[ving] been overborne.'" *United States v. Watson*, 423 U.S. 411, 424 (1976) (quoting *Schneckloth*, 412 U.S. at 225).

Smith focuses his argument on the fact that Barnes-Christian repeatedly came up to him and tried to get his attention. To support his assertion, he cites *Commonwealth v. Ealy*, 12 Va. App. 744 (1991), where Ealy's mother's consent was found to be involuntary after several officers parked in front of her home without stating their purpose, left, returned, questioned her daughter, and finally obtained Ealy's mother's consent to search her garage while she was sitting in their police car. *Id.* at 753-54. In addition to distinct facts, the posture of that case distinguishes it from the case before us. In *Ealy*, this Court *affirmed* the trial court's determination that consent was not voluntary, considering the finding not to be clearly erroneous, *id.*, whereas Smith asks us to *reverse* the trial court's finding. Our standard of review controls this issue and requires us to affirm the finding that Smith's consent was voluntary.

Considering the totality of the circumstances, the trial court did not clearly err in finding Smith's consent voluntary. Smith verbally agreed to a "pat-down" after he was asked if he had a firearm. Smith was an adult, was detained for a matter of seconds prior to the discovery of the firearm, and was not subjected to "repeated and prolonged" questioning. *Schneckloth*, 412 U.S. at 226. Barnes-Christian only spoke twice to Smith prior to Smith's consent to the search, once while Barnes-Christian was still inside his police car and once after Barnes-Christian parked and approached Smith. Additionally, the conditions of the search by no means clearly show that Smith's will was overborne by Barnes-Christian's conduct. *See Lattimore*, 87 F.3d at 650. Barnes-Christian spoke conversationally, phrased the request in a manner that required Smith to give an affirmative response to consent, and, according to his testimony, which was given weight by the factfinder, did not touch Smith before consent was given. He was the only officer present and did not display his weapon. Smith points to other facts that may run contrary to the finding of voluntariness, such as the fact that Barnes-Christian "continued following" Smith toward his apartment and was an armed officer approaching a black man at night. But as noted above, our standard of review requires that we only ask whether the trial court clearly erred in making its determination. There is evidence to support its finding that Smith voluntarily consented to the search.[4]

---

[4] On appeal, Smith argues another point related to whether his consent was voluntary. He argues that portions of Barnes-Christian's testimony establishing that Smith consented to the search were inherently incredible, particularly the testimony that the officer grabbed Smith's jacket after—rather than before—Smith gave his consent for the pat down and whether Smith was in fact commanded to stop. We will not address the merits of this point because Smith did not raise it to the trial court and so failed to preserve it for appeal. At the hearing on the motion to suppress, Smith did not argue that Barnes-Christian's testimony was inherently incredible. Instead, defense counsel acknowledged that there was "some dispute over whether there was an actual call to stop." Defense counsel noted that Barnes-Christian's testimony differed as to whether he told Smith to stop, whereas "Smith testified unimpeached" that he was given the order. This merely reflects counsel's attempts to persuade the trial court to credit Smith's testimony as credible, which it did not do, and does not disclose an inherently-incredible-testimony objection.

*C. Whether the Encounter was Consensual*

In his final argument, Smith claims that the encounter with Barnes-Christian was not consensual because a reasonable person in Smith's position would not have felt free to leave. We review de novo a trial court's determination of whether an officer's encounter with a citizen was consensual or a seizure implicating the Fourth Amendment. *Harris v. Commonwealth*, 266 Va. 28, 32 (2003). An encounter is a seizure if a reasonable person would not have felt "free to leave" under the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Though we review the question of seizure de novo, we must "give deference to the factual findings" of the trial court establishing whether a certain circumstance relevant to that question exists or not. *See McCain v. Commonwealth*, 261 Va. 483, 490 (2001); *Davis*, 37 Va. App. at 429. Some relevant circumstances that may indicate a seizure to be present are "the threatening presence of several officers," "the display of a weapon by an officer," "some physical touching" of the suspect, and "the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

An officer who approaches an individual in a "public place[] to ask . . . questions and to request consent to search" has not seized that individual if "a reasonable person would understand that he or she could refuse to cooperate." *Florida v. Bostick*, 501 U.S. 429, 431 (1991). The right to refuse to cooperate, or being free to leave, entails "the ability to ignore the police and to walk away" or "feel[ing] free to decline the officer['s] requests." *See Payne v. Commonwealth*, 14 Va. App. 86, 89 (1992) (internal quotations and citations omitted).

We find that a reasonable person would have felt free to leave under the circumstances and that the encounter was thus a consensual interaction, not a seizure. The findings of fact made by the trial court indicate that Barnes-Christian was the only officer present and that he did not display his weapon or touch Smith prior to receiving Smith's consent. Barnes-Christian's

tone of voice was conversational. The wording of his request for Smith's consent to a pat down required Smith to reply yes or no, which gave Smith the opportunity to decline the request. Though Barnes-Christian did not tell Smith that he could leave, the trial court noted that there was "no conversation one way or the other" about whether he could leave, owing to Smith "stop[ping] upon the request." The lack of such a statement from Barnes-Christian may be a factor in assessing a seizure but is not a dispositive one. *See Harris*, 266 Va. at 32 ("There is no 'litmus test' for determining whether an encounter is consensual or constitutes an illegal seizure." (quoting *Florida v. Royer*, 460 U.S. 491, 506 (1983))). Its importance in this case is lessened by the speed at which the encounter took place, which as the trial court stated did not give the parties much chance to discuss the matter.

Smith asserts that Barnes-Christian's request for a pat down conveyed to Smith a message that compliance with his requests was required, since by asking whether Smith had a firearm he thereby accused Smith of engaging in illegal activity. Smith cites *McGee v. Commonwealth*, a case in which three officers, acting on a dispatch concerning a man selling drugs on a certain street corner, parked their two police cars and approached McGee who was at the location. 25 Va. App. at 196. The officers told McGee that they had gotten a tip that he "was on this corner selling drugs" and that he "matched the description" of the reported individual, then asked for and obtained his consent to a pat down. *Id.* This Court found that the encounter was an illegal stop: "When confronted with an accusation from police, such as, 'we know you are selling drugs from this location, let us search you,' no reasonable person would feel free to leave." *Id.* at 200.

The differences between Smith's case and *McGee* are more striking than the similarities. In *McGee*, three officers told McGee that he matched a specific description placing the suspect for whom they were searching precisely where McGee was located and "expressly inform[ing]

[him] that they ha[d] received information that [he was] engaging in criminal activity." *Id.* at 196, 200. Thus, "the manner in which the police identified [McGee] as a suspect" conveyed to him the message that he was "not free to leave." *Id.* at 200-01. By contrast, Barnes-Christian did not tell Smith that Smith was the target of an investigation or that he fit a certain description or was at a suspect's rumored location. We do not believe that a reasonable person would have viewed Barnes-Christian's conversational question asking Smith if he had a firearm as informing Smith that he "has been specifically identified as a suspect in a particular crime which the officer is investigating." *Id.* at 200. In fact, Barnes-Christian had not received any information concerning Smith and was not investigating him until he saw the bulge in Smith's jacket.

## CONCLUSION

The trial court properly denied the motion to suppress on all issues. Officer Barnes-Christian conducted a proper pat down during a consensual encounter and did not exceed the scope of Smith's freely given consent. We affirm the judgment.

*Affirmed.*